**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MELVIN DEAN BROWN,**

        **Plaintiff,**

v.                                   **Case No. 8:08-cv-168-T-TBM**

**THE TRAVELERS INDEMNITY**
**COMPANY,**

        **Defendant.**

_____/

**O R D E R**

THIS MATTER is before the court on **Defendant, The Travelers Indemnity Company's, Motion for Summary Judgment of Plaintiff's Count I (Silent Fraud) and Count III (Negligence) and for Partial Summary Judgment of Count IV (Breach of Contract) and Incorporated Memorandum of Law** (Doc. 123) and Plaintiff's memorandum in opposition (Doc. 124). Oral arguments on the motion were conducted November 19, 2010.

I.

Plaintiff, Melvin Dean Brown (Brown or Plaintiff), sues his no-fault automobile insurer, The Travelers Indemnity Company (Travelers or Defendant), following a 1974 motor vehicle accident in Michigan which rendered him quadriplegic. The claims remaining under the Amended Complaint are for silent fraud (Count I), negligence (Count III), and breach of

contract (Count IV).[1]  It is undisputed that Brown was covered by the insurance policy issued

by Travelers for the injuries he sustained in the accident, and that benefits under the policy

have been paid and continue to be paid to date.  (Doc. 123-2 at 61).  At this point, the dispute

centers on whether Plaintiff is entitled to additional monies for past attendant care benefits.

By Plaintiff's claim, he is entitled to additional attendant care benefits dating back to 1974 for

the attendant care provided by his mother and other family members.[2]  On the claims for silent

fraud and negligence, Plaintiff urges that Travelers owed him a duty to explain his benefits

which it breached.  Even in the absence of such duty, to the extent that it responded to

inquiries by Plaintiff or his family, Defendant deliberately created a false impression about

both the nature and extent of attendant care benefits, and similarly, when it voluntarily

undertook to explain the benefits, it failed to speak fully and accurately about such benefits.

Plaintiff urges that the claims are not time-barred by reason of the Defendant's fraudulent

concealment and on principles of equitable estoppel.  On his breach of contract claim, he

---

[1]The claims are governed by Michigan law.  This court previously granted Defendant's motion to dismiss with regard to Plaintiff's fraud claim (Count II), and dismissed, in part, the breach of contract claim (Count IV) to the extent that the doctrine of res judicata barred Plaintiff from seeking personal injury protection (PIP) benefits prior to the settlement of June 22, 1976.  *See* (Docs. 74, 80).

[2]Under Michigan's No-Fault Benefits law, attendant care benefits are "allowable expenses" consisting of "all reasonable charges incurred for reasonably necessary . . . services . . ."  *See* MCL § 500.3107(1)(a).  Such allowable expenses are unlimited under Michigan law.  *See, e.g., In re Certified Question* (*Preferred Risk Mut. Ins. Co. v. Mich. Catastrophic Claims Ass'n*), 449 N.W.2d 660, 661 (Mich. 1989) (noting that Michigan's no-fault law provides for unlimited personal injury protection benefits).

seeks similar past benefits despite Michigan's one-year-back rule as set forth at MCL § 500.3145(1).[3]

Travelers generally denies liability on the bases of the facts and law.  On this motion, Travelers urges that both the silent fraud claim and the negligence claim fail because it had no affirmative duty to explain benefits to Plaintiff and the undisputed facts establish that Travelers did not voluntarily undertake to act as an advisor or to explain benefits to Plaintiff, nor did its agents make any voluntary, partial, incomplete and/or misleading disclosures related to benefits under the policy thereby invoking such duty.  On the silent fraud claim, Travelers further argues that, as a matter of law, Plaintiff cannot prove the reasonable reliance necessary in order to state the claim.  Specifically, Travelers submits that Plaintiff could not reasonably rely on any alleged false impression or alleged statement by Travelers about the extent of attendant care benefits available under the policy because he had the means to determine the accuracy of the same by consulting an attorney.  Additionally, because Travelers paid for additional receipts submitted for attendant care expenses over and above the eight-hundred dollar figure which Plaintiff allegedly believed to be the extent of his coverage, Plaintiff knew or should have realized that the amount paid for such care was not the maximum amount payable under his policy for family-provided attendant care.  At the hearing, Defendant also argued that there can be no reasonable reliance where the issue is entitlement under a statute.  Stated another way, when the issue is knowledge of the law, it

---

[3]The one-year back rule provides in pertinent part that "the claimant may not recover benefits for any portion of the loss incurred more than 1 year before the date on which the action was commenced."  MCL § 500.3145(1).

3

cannot be the basis of reasonable reliance because every person is charged with knowing the law.  Defendant also contends that both the silent fraud claim and the negligence claim are time-barred because neither the state fraudulent concealment statute nor the doctrine of equitable estoppel apply.  As for the contract claim, Defendant maintains that it is governed by Michigan's one-year-back rule.

In his response, Brown generally asserts that Traveler's own documents and its communications with him and his mother reveal that Travelers engaged in a purposeful scheme to keep them in the dark and created false impressions as to his benefits under the policy in order to avoid paying higher costs for Plaintiff's attendant care.  He urges that there is ample evidence by which a jury could conclude from his inquiries that Travelers had a duty to disclose fully and accurately his attendant care benefits and instead of doing so it created the false impression that he was receiving all such benefits to which he was entitled.  Separately from its inaccurate and incomplete responses to the inquiries, he asserts that Travelers undertook the duty to explain his benefits very early on, but failed to do so fully and completely.  As for Travelers' reliance argument, Plaintiff argues that the disputed facts dictate that the matter cannot be decided on this motion and must be decided by a jury and, in any event, he and his family actually relied on the representations of Defendant.  The same course of fraudulent conduct by Defendant supporting the silent fraud claim supports his position on the application of the Michigan fraudulent concealment statute to extend the statute of limitations and principles of equitable estoppel to preclude Defendant from asserting

the statute of limitations as a bar.  He urges that the same inequitable conduct precludes the

application of the one-year-back rule to his breach of contract claim.

II.

The court shall grant summary judgment for the moving party only when "the

pleadings, the discovery and disclosure materials on file, and any affidavits show that there is

no genuine issue as to any material fact and that the movant is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c).  The movant bears the exacting burden of

demonstrating that there is no dispute as to any material fact in the case.  *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 323 (1986); *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 918

(11th Cir. 1993).

Once the moving party satisfies its burden, the burden shifts to the non-moving party

to establish the existence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 324;

*Howard v. BP Oil Co.,* 32 F.3d 520, 524 (11th Cir. 1994).  The non-movant must designate

specific facts showing a genuine issue for trial beyond mere allegations or the party's

perception.  *Perkins v. Sch. Bd. of Pinellas County*, 902 F. Supp. 1503, 1505 (M.D. Fla.

1995).  It must set forth, by affidavit or other appropriate means, specific facts showing that

there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e)(2).

When deciding a motion for summary judgment, "[i]t is not part of the court's

function . . . to decide issues of material fact, but rather determine whether such issues exist to

be tried . . ." and "[t]he court must avoid weighing conflicting evidence or making credibility

determinations."  *Hairston*, 9 F.3d at 919 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

5

242 (1986)).  The only determination for the court in a summary judgment proceeding is whether there exists genuine and material issues of fact to be tried.  *Hairston*, 9 F.3d at 921; *see also Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 959 (11th Cir. 1997). All the evidence and inferences from the underlying facts must be viewed in the light most favorable to the nonmoving party.  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997).

III.

A.

As this court has previously stated, "silent fraud," also known as "fraud by nondisclosure or fraudulent concealment," arises from the suppression of the truth with the intent to defraud.  The suppression of a material fact is equivalent to a false representation where a party is duty-bound to disclose such fact, and thus will support an action in fraud. *M&D, Inc. v. W.B. McConkey,* 585 N.W.2d 33, 37 (Mich. Ct. App. 1998).  While Michigan law recognizes that fraud may be committed by suppression of the truth as well as by open false assertions, "in order for the suppression of information to constitute silent fraud there must be a legal or equitable duty of disclosure."  *U.S. Fid. & Guar. Co. v. Black*, 313 N.W.2d 77, 88 (Mich. 1981).

As a general principle, Michigan law imposes no affirmative duty on an insurer to act as an advisor with respect to informing an insured of benefits that are covered by the policy or provided by statute.  As a consequence, there is no cause of action for silent fraud against an insurer merely by reason of an insurer's nondisclosure of benefits.  *See Buntea v. State Farm*

6

*Mut. Auto Ins. Co.*, 467 F. Supp. 2d 740, 745 (E.D. Mich. 2006); *Van Emon v. State Farm Mut. Auto Ins. Co.,* No. 05-72638, 2007 WL 275882, at *3 (E.D. Mich. Jan. 26, 2007). However, numerous Michigan courts have recognized a legal duty in circumstances where a party voluntarily undertakes or assumes to act.  In such circumstances, a duty voluntarily assumed must be handled with care and skill.  *See, e.g., Zychowski v. A.J. Marshall Co.*, 590 N.W.2d 301, 302 (Mich. Ct. App. 1998); *Baker v. Arbor Drugs, Inc.*, 544 N.W.2d 727, 731 (Mich. Ct. App. 1996).[4]  Similarly, where a party undertakes to respond to an inquiry in a commercial relationship, it may not give partial answers leading to false impressions or intended to mislead.  *See, e.g., Sullivan v. Ulrich,* 40 N.W.2d 126, 131-32 (Mich. 1949) ("the concealment of the true facts and the deliberate creating of false impressions and inferences is the equivalent of an express and intentional misrepresentation") (citing *Groening v. Opsata,* 34 N.W.2d 560 (Mich. 1948)).  *Buntea* supports that in such circumstances a claim for silent fraud may pertain; "[t]he misrepresentation occurs when a party suppresses part of the truth when asked, not by mere nondisclosure."  *Buntea,*467 F. Supp. 2d at 745.

Similarly, in the negligence context, "[i]f one voluntarily undertakes to perform an act, having no prior obligation to do so, a duty may arise to perform the act in a non-negligent manner."  *Fultz v. Union-Commerce Assocs.,* 683 N.W.2d 587, 591 (Mich. 2004).  Or, as stated by the court in *Buntea* in discussing the negligence claim, even in the absence of a duty to affirmatively disclose the benefits under a policy, "[a] defendant has a duty not to

---

[4]Although the cited cases appear to be based on negligence claims, it appears undisputed that the same principle would apply equally to the fraud claim.

misrepresent or withhold information regarding [a] plaintiff's policy, if asked, . . ." *Buntea*,

467 F. Supp. 2d at 748.

In this case, the court must determine the threshold dispute whether Plaintiff is time-

barred from asserting his silent fraud and negligence claims.[5]  "In the absence of disputed

facts, the question whether a plaintiff's action is barred by the statute of limitations is a

question of law, to be determined by the trial judge." *Moll v. Abbott Labs.*, 506 N.W.2d 816

(Mich. 1993).  The statute of limitations for a fraud claim in Michigan is six years and for a

negligence claim is three years.  *See* MCL §§ 600.5813, 600.5805(10).  Under Michigan law,

it is the general rule that exceptions to statutes of limitation are to be strictly construed.  *Mair*

*v. Consumers Power Co.*, 348 N.W.2d 256, 259 (Mich. 1984).

As noted above, Plaintiff urges that Michigan's fraudulent concealment statute, MCL

§ 600.5855, and the doctrine of equitable estoppel apply to prevent Defendant from raising a

statute of limitations defense.  The fraudulent concealment statute provides:

> If a person who is or may be liable for any claim fraudulently conceals
> the existence of the claim or the identity of any person who is liable for
> the claim from the knowledge of the person entitled to sue on the claim,
> the action may be commenced at any time within 2 years after the person
> who is entitled to bring the action discovers, or should have discovered,
> the existence of the claim or the identity of the person who is liable for
> the claim, although the action would otherwise be barred by the period of
> limitations.

---

[5]In rendering the report and recommendation on Defendant's motion to dismiss, this court acknowledged that "[i]t is most probable that at some point the alleged fraud would have or should have become known to the Plaintiff such that the limitations clock began ticking." (Doc. 74 at 28).  Ruling on the statute of limitations defense was deferred pending further development of the factual record.

MCL § 600.5855.  "Fraudulent concealment means employment of artifice, planned to prevent

inquiry or escape investigation, and mislead or hinder acquirement of information disclosing a

right of action. The acts relied on must be of an affirmative character and fraudulent."

*Tonegatto v. Budak*, 316 N.W.2d 262, 266 (Mich. Ct. App. 1982) (*quoting De Haan v.*

*Winter*, 241 N.W. 923 (Mich. 1932)).

Under Michigan law, equitable estoppel "'is essentially a doctrine of waiver' which

'serves to extend the applicable statute of limitations- by precluding the defendant from

raising the bar of the statute.'" *Lothian v. Detroit*, 324 N.W.2d 9, 17-18 (Mich. 1982)

(*quoting Huhtala v. Travelers Ins. Co.*, 257 N.W.2d 640 (Mich. 1977)).  One who seeks to

invoke the doctrine generally must establish that there has been (1) a false representation or

concealment of a material fact, (2) an expectation that the other party will rely on the

misconduct, and (3) knowledge of the actual facts on the part of the representing or concealing

party. *Cincinnati Ins. Co. v. Citizens Ins. Co.*, 562 N.W.2d 648, 651 (Mich. 1997).  "This

court has been reluctant to recognize an estoppel absent intentional or negligent conduct

designed to induce a plaintiff to refrain from bringing a timely action." *Id.*, citing *Lothian*, 324

N.W.2d at 18.  "Both equitable estoppel and promissory estoppel require justifiable reliance

on the part of the party asserting estoppel." *Cincinnati Ins. Co.*, 562 N.W.2d at 650.  Here, I

find it appropriate to address the statute of limitations challenge first.

### B.

At the outset, it is worth quoting from Judge Neff's recent decision in *Chandler v.*

*Wackenhut Corp.*, No. 1:08-cv-1197, 2010 WL 307908 (W.D. Mich. 2010).  There, as a

predicate to addressing similar issues under the Michigan fraudulent concealment statute and the doctrine of equitable estoppel, the court stated, "[p]eriods of limitation are statutes of repose established to extinguish rights, justifiable or not, that might otherwise be asserted." *Id.* at *3. Such statutory limitations are not "simply technicalities" but rather "fundamental to a well-ordered judicial system." *Id.* And, "limitations periods are designed to compel plaintiffs to exercise their rights of action within a reasonable time, protect potential defendants from the protracted fear of litigation, and promote judicial efficiency by preventing defendants and courts from having to litigate stale claims." *Id.* Despite the tragic turn of events that left Plaintiff severely and permanently injured, these principles apply with equal force to his case.

Plaintiff asserts that his claims for silent fraud and negligence survive the statute of limitations challenge because the same fraudulent conduct supporting the claims serves to establish the fraudulent concealment necessary to satisfy the Michigan fraudulent concealment statute and the inequitable conduct necessary to invoke the doctrine of equitable estoppel. Addressing the fraudulent concealment statute first, I conclude that the statute provides Plaintiff no safe harbor from the time-bar challenge.[6] Here, even if Plaintiff's version of the facts and inferences therefrom are fully credited and the court accepts that Defendant engaged in a course of fraudulent (or negligent) conduct beginning in 1975 which was intended to and which did, in fact, create a false impression, upon which Plaintiff reasonably relied, and which

---

[6]A time line of communications with and regarding Plaintiff is useful in resolving the disputes on this motion. Thus, attached as an Appendix is a factual time line compiled from information contained in the exhibits submitted by the parties in support of or in opposition to Defendant's motion for summary judgment.

served to deprive Plaintiff of his full complement of attendant care benefits for thirty years, the Plaintiff himself testifies that he discovered that he had been "cheated" out of his full complement of such benefits in 2005.  (Doc. 123-3 at 31).  Suit in this case was not commenced until January 24, 2008, outside the extended (2-year) limitations period provided by the statute.

In combination, the provisions of MCL §§ 600.5813 and 600.5855, prescribe that ". . . a plaintiff now has, in any case, the full period of six years from the date of the fraudulent act, or other act creating the cause of action, within which to initiate suit, and moreover, where the defendant has fraudulently concealed from him his cause of action, he has, under any circumstances, not less than the full period of two years from date of discovery in which to bring his action."  *See Boyle v. Gen. Motors Corp.*, 661 N.W.2d 557, 559 n.3 (Mich. 2003) (citing *Ramsey v. Child, Hulswit & Co.*, 165 N.W. 936 (1917)).  Here, fully crediting Plaintiff's version of the facts, he was first harmed by Defendant's fraud (or negligence) in early 1975.  Six years from the date of the alleged fraudulent act, i.e., when Plaintiff was harmed,[7] would be early 1981.  Thus, the statute of limitations on both claims would have run long before the suit was filed, absent some basis to extend the limitations period.  Under the fraudulent concealment statute, Plaintiff was entitled to an additional two years from when he discovered or should have discovered his cause of action.  While Plaintiff arguably should have known of his claim for additional attendant care benefits long before 2005, fully

---

[7]"The wrong is done when the plaintiff is harmed rather than when the defendant acted."  *Boyle*, 661 N.W.2d at 560 n.5 (citing *Stephens v. Dixon*, 536 N.W.2d 755 (Mich. 1995)).

crediting his testimony that he did not know until then, his claims were still not brought within two years from his discovery of the claim and thus they are barred.[8]

Plaintiff alternatively argues that the Defendant is equitably estopped to argue that the claims are time-barred. While that claim is slightly more problematic, I conclude again that the claims are time-barred where the bases of the estoppel are the same alleged acts of fraudulent concealment relied upon by the Plaintiff to invoke the extended limitations period set forth in the fraudulent concealment statute. Although the current status of the equitable estoppel doctrine under Michigan law is somewhat unclear,[9] I am persuaded that such conclusion is appropriate in light of the Michigan Supreme Court's decision in *Trentadue*,

---

[8]I find it unnecessary to address in detail Defendant's argument which urges that Plaintiff should have been aware of his claims nearly from the outset of these events. However, it is perhaps worth adding here that under Michigan law, a plaintiff "may not toll a limitations period simply by claiming he reasonably had no knowledge of the tort . . . ; rather he must allege [and prove] fraudulent concealment." *Chandler*, 2010 WL 307908, at *4 (citing *Trentadue v. Gorton*, 738 N.W.2d 664 (Mich. 2007)). Furthermore, Michigan's fraudulent concealment statute requires "diligent discovery of the facts." *Id.* at *7. While Plaintiff's deposition testimony reveals that he *knew* of his harm as of 2005, even in a light most favorable to Plaintiff, the claims history suggests he *should have known* of his claim much earlier and surely by no later than 1983 when the Michigan court made clear that family members are entitled to be paid at reasonable market rates for providing attendant care services. *See Manley v. Detroit Auto. Inter-Ins. Exch.,* 339 N.W.2d 205, 211 (Mich. Ct. App. 1983). Plaintiff offers no real proof of how or why any alleged acts of concealment or silence by Defendant prevented him (or his attorneys) from recognizing this claim for attendant care benefits by that early date. In light of Plaintiff's testimony that he knew of a potential claim in 2005, the court need not delve into the matter further.

[9]In *Chandler,* while addressing the parties' arguments concerning the equitable estoppel doctrine, the court found the current status of the doctrine unclear. Thus, while the Michigan Supreme Court decision's in *Trentadue v. Gorton, supra,* appears to reject that the doctrine tolls the running of the statute of limitations given the comprehensive nature of the statutory scheme, several decisions of the lower appellate courts since *Trentadue* suggest the continued viability of the doctrine. *See Chandler*, 2010 WL 307908, at *10.

*supra*.  Stated otherwise, in the given facts and circumstances, Plaintiff may not claim the benefit of an equitable tolling of the statute of limitations on grounds that Defendant fraudulently concealed his cause of action beyond that permitted by the Michigan Legislature in the fraudulent concealment statute.

In *Trentadue*, the court addressed a lower court ruling that the limitations period for a wrongful death action was tolled during the period before plaintiff discovered the killer's identity.  738 N.W.2d at 666-67.  In rejecting the so-called "discovery rule" in light of the state's comprehensive statutory limitations scheme, the court noted that "[i]n general, where comprehensive legislation prescribes in detail a course of conduct to pursue and the parties and things affected, and designates specific limitations and exceptions, the Legislature will be found to have intended that the statute supersede and replace the common law dealing with the subject matter."  *Id.* at 671.  The court further explained its rationale as follows:

> MCL 600.5855 is a good indication that the Legislature
> intended the scheme to be comprehensive and exclusive.
> MCL 600.5855 provides for essentially unlimited tolling
> based on discovery when a claim is fraudulently concealed.
> If we may simply apply an extrastatutory discovery rule in
> any case not addressed by the statutory scheme, we will
> render § 5855 effectively meaningless.  For, under a general
> extrastatutory discovery rule, a plaintiff could toll the
> limitations period simply by claiming that he reasonably had
> no knowledge of the tort or the identity of the tortfeasor.  He
> would never need to establish that the claim or tortfeasor had
> been fraudulently concealed.

*Id.*  Further, "the Legislature has undertaken the necessary task of balancing plaintiffs' and defendants' interests and has allowed for tolling only where it sees fit."  *Id.* at 672.  Thus, "[s]ince the Legislature has exercised its power to establish tolling based on discovery under

particular circumstances, but has not provided for a general discovery rule that tolls or delays the time of accrual if a plaintiff fails to discover the elements of a cause of action during the limitations period, no such tolling is allowed. . . . [C]ourts may not employ an extrastatutory discovery rule to toll accrual." *Id*. By my consideration, this same rationale dictates that in this case, the doctrine of equitable estoppel may not be invoked to toll the applicable statute of limitations for either the silent fraud or negligence claim beyond that permitted under the fraudulent concealment statute, MCL § 600.5855.[10] In sum, I find the silent fraud and negligence claims time-barred.

C.

As for Plaintiff's breach of contract claim, he seeks recovery under the state no-fault law for his attendant care benefits at a commercial market rate. There is no dispute that Plaintiff's claim is timely filed, and Defendant makes no argument that Plaintiff cannot proceed on the claim. However, Defendant maintains that the claim is governed by Michigan's one-year-back rule. In response, Plaintiff maintains that "equitable considerations, including fraud, mutual mistake, estoppel, or other unusual circumstances, can prevent the application of the so-called one-year-back rule of MCL § 500.3145(1)" and do so in this case. (Doc. 124 at 16). He broadly urges that "the overwhelming inequitable conduct"

---

[10]For each asserted defense to the statute of limitations' claim, Plaintiff relies on the same alleged course of fraudulent conduct and silence by the Defendant. In light of the breadth of the *Trentadue* holding, I can discern no rational basis for affording the equitable estoppel defense to the limitations period any different consideration or application than that afforded Plaintiff on his fraudulent concealment argument. In these circumstances, the limitations period is that set forth in MCL § 600.5855.

14

by Defendant in order to save money "inevitably leads to the conclusion that the one-year-back rule is inapplicable." *Id.*

While the Michigan Supreme Court has determined that the one-year-back rule is to be enforced according to its plain language, it has also stated that "in the context of a no-fault claim, this Court may exercise its equitable power to avoid the application of the one-year-back rule, if there are allegations of fraud, mutual mistake, or other unusual circumstances." *Cooper v. Auto Club Ass'n*, 751 N.W.2d 443, 450 (Mich. 2008) (citing *Devillers v. Auto Club Ins. Ass'n*, 702 N.W.2d 539 (Mich. 2005)).[11]  However, such equitable power "is not an unrestricted license for the court to engage in wholesale policymaking." *Devillers,* 702 N.W.2d at 556.  The court further noted that, "absent intentional or negligent conduct designed to induce a plaintiff from bringing a timely action," it was reluctant to recognize equitable estoppel.  *Id.* n.64 (quoting *Cincinnati Ins. Co.,* 562 N.W.2d at 651).  Under Michigan law, "[w]here an allegation of estoppel raises factual questions on which reasonable minds might disagree, the questions must be resolved at trial by the trier of fact.  However, where the facts are not in dispute or are beyond dispute, the existence of estoppel is a question of law." *J.C. Wyckoff & Assocs., Inc.*, 936 F.2d 1474 (6th Cir. 1991) (citing *Anderson v. Sanders*, 165 N.W.2d 290 (Mich. Ct. App. 1968)).

---

[11]In the context of this case, the dispute is over the application of the damages limitation provision of the  one-year-back rule and not the provision prescribing when suit may be filed. *See Cameron v. Auto Club Ins. Ass'n,* 718 N.W.2d 784, 788-89 (2006), overruled on other grounds in *Regents of the Univ. of Mich. v. Titan Ins. Co.*, No. 136905, 2010 WL 3037798 (Mich. 2010); *Devillers,* 702 N.W.2d at 547.

After full consideration of the proffered evidence, I conclude that Plaintiff's claim is appropriately governed by the one-year-back rule.  In a light most favorable to Plaintiff, Defendant *has* acted throughout the long history of this claim in its own self-interest to hold down its costs related to attendant care.  And, arguably, in its early dealings with Plaintiff and his mother, Defendant's representatives failed to answer accurately or completely the mother's inquiry concerning no-fault benefits for care she provided Plaintiff and arguably sought to and did mislead Plaintiff as to the nature and scope of attendant care benefits under the no-fault law.  However, by my consideration, these events carry Plaintiff's claim only so far and cannot offer the justification necessary for ignoring the one-year-back rule for a suit commenced in 2008.  Thus, even if Plaintiff and his family were justified in the early years of this claim in relying on a false impression that the benefits being paid for attendant care were all he was entitled to, at least by the time of the *Manley* decision in 1983, Plaintiff's right under Michigan law to claim a reasonable market value for such attendant care was clearly established.  *See Manley,* 339 N.W.2d at 211.  Any reliance on the demonstrated communications and actions of Defendant thereafter appears unjustified as a matter of law.  In Michigan, one is assumed to know the law.  *See Adams Outdoor Adver. v. E. Lansing (after remand),* 614 N.W.2d 634, 639 n.7 (Mich. 2000).  As the record reveals, for several years prior to the *Manley* decision, (and after that date as well), Plaintiff was represented by counsel on his no-fault claim.  The proffered correspondence indicates that counsel was aware of the benefits paid the mother and yet made no complaints or inquiries about the same.  Even after *Manley* clarified the matter, counsel took no action to obtain more money for the family's

16

services.  As previously discussed, Defendant's silence about such benefits offers no

additional consolation to Plaintiff absent a duty to speak on Defendant's part and such duty is

not here demonstrated.  *See Chandler,* 2010 WL 307908, at *11(citing *Conagra, Inc. v.*

*Farmer State Bank*, 602 N.W.2d 390, 405-06 (Mich. Ct. App.1999)).  From all that is

revealed by the evidence, Plaintiff's right to claim more money for such attendant care

benefits was not a matter known only to Defendant, and in the given circumstances after

*Manley* (and perhaps even before that decision), Plaintiff cannot claim to have justifiably or

reasonably relied on any false impression related to these benefits.

As set forth in the Appendix, Plaintiff makes no showing that any later conduct or

communications by the Defendant upon which he relied served to induce him not to bring a

no-fault claim for additional attendant care benefits such that Defendant should be estopped

from raising the damages limitation of the one-year-back rule.  Apart from one specific

inquiry about such matters, the benefits for nursing care by family members and others was

paid without protest.  Accepting his version of the facts, and assuming on this motion that

such may be admissible at trial, in 1982, Plaintiff's mother specifically inquired and was told

by Defendant that the $800 per month she was then receiving was all there was for such care.

Even if such response was false and intended to mislead Plaintiff, under Michigan law,

Plaintiff could not blindly accept nor reasonably rely on such representation.  *See Cooper,* 751

N.W.2d at 451-52 (where alleged misrepresentations do not involve information or facts

exclusively known to the defendant, and where the plaintiff has the means to determine their

truth, a plaintiff cannot reasonably rely on those representations); *see also Burger v. Allstate*

*Ins. Co.,* 667 F. Supp. 2d 738, 746 (E.D. Mich. 2009) (an insured party is presumed to have read the terms of his insurance policy and cannot reasonably rely on any conflicting statement about the policy; and "fraud cannot be perpetrated upon one who has full knowledge to the contrary of a representation") (citing *Montgomery Ward & Co. v. Williams*, 47 N.W.2d 607, 611 (Mich. 1951)); *Nieves v. Bell Indus., Inc.*, 517 N.W.2d 235, 238 (Mich. App. 1994) ("there can be no fraud where a person has the means to determine that a representation is not true).[12]  For whatever reason, Plaintiff appears never to have spoken to his attorneys about such matters nor did his attorneys ever pursue the matter until present counsel was retained. And, the proffered evidence reveals that neither Plaintiff nor his family ever demanded more money for such care.  Pertinent to the issue of estoppel, beyond urging the unfairness of Defendant's self-serving claims handling and a lack of disclosure, Plaintiff offers no real proof of how Defendant's conduct or silence on the matter prevented him or his attorneys from recognizing this claim for additional attendant care benefits and from asserting the claim at a much earlier time.  *See Cincinnati Ins. Co.,* 562 N.W.2d at 651 (citing *Lothian*, 324 N.W.2d at 18) ("court has been reluctant to recognize an estoppel absent intentional or negligent conduct designed to induce a plaintiff to refrain from bringing a timely action").  In the circumstances of this case, such is not enough and Plaintiff otherwise fails to demonstrate by any competent evidence as to the existence of a question of fact requiring a jury's

---

[12]As reflected in the Appendix, expressions of concern were generally met with silence.  In one later instance, a representative suggested to Plaintiff that care by relatives would not be paid at agency rates.  Under Michigan law, Plaintiff could not justifiably rely on such representation as he had the means to learn of his rights on his own.

consideration of the equitable estoppel claim as an avoidance of the one-year-back rule. The

claim for such no-fault benefits shall proceed forward, but subject to the one-year-back rule.

IV.

Accordingly, for the reasons stated above, Defendant's Motion (Doc. 123) for Final

Summary Judgment as to Count I (Silent Fraud) and Count III (Negligence) is **granted**, and

Defendant's Motion (Doc. 123) for partial summary judgment as to Count IV (Breach of

Contract) is **granted** as set forth herein.

**Done and Ordered** in Tampa, Florida, this 6th day of January 2011.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:
Counsel of Record

**Appendix**

2/7/74    Plaintiff involved in accident rendering him quadriplegic (Doc. 124-2).

2/14/74   Letter from attorney Serotkin to Travelers to advise of his representation of Plaintiff.
          (Doc. 123-4).

2/21/75   Claim file note documenting that Plaintiff's mother (Helen Brown) inquired about
          whether or not there would be money available to her under the $20.00 per day
          services portion of the No-Fault Law; Adjuster notes that Plaintiff is in good spirits
          and not too depressed; Helen Brown is "exactly the opposite;" note also reflects
          Defendant's consensus that services of a trained housekeeper or practical nurse
          would be allowable to Plaintiff and that such would run far in excess of the $20.00
          cap under the services portion of the policy; adjuster recommends Plaintiff be paid
          under the services portion of the policy so that Defendant could retain control over
          the amount of money spent in this regard, stating "[t]hat is why I believe it would be
          advantageous for us to keep Mrs. Brown and [Plaintiff] under our control, by
          pleasing them this way;" adjuster further notes that Helen Brown is not looking to
          drain money from the policy and that he has not spoken with Plaintiff's attorney in
          over three months.  (Doc. 124-6).

2/25/75   Letter from Helen Brown to Travelers outlining everything she has been doing for
          Plaintiff since he was discharged from the hospital October 18, 1974, and requesting
          payment for her services from that date stating, "[h]e is my son and I don't begrudge
          this, but having a husband and two other children and a house to keep up.  It makes it
          hard on all of us as a family. . . . I feel that if I was paid for my services, I could in
          turn get someone in once and a while to help me out." (Doc. 124-7).

3/4/75    Claim file note in which adjuster opines that Helen Brown should be paid under the
          medical benefit rather than the services benefit of the policy for the treatment she
          provides to Plaintiff; his instructions to "dicker" with Mrs. Brown to get the best
          possible agreement on what to pay her weekly; his view that he can probably settle
          on a figure around $60.00 to $70.00 per week; and his opinion that if Mrs. Brown
          hired a trained housekeeper, Travelers "would be hit for a hell of a lot more."  (Doc.
          124-8).

3/5/75    Letter from Helen Brown to Michigan Insurance Bureau inquiring why Travelers
          would have stopped paying Plaintiff's lost wages because he was laid off and asking
          for inquiry; discussing everything she does for Plaintiff's care; and noting,  "I do
          know there is a $20.00 dollar a day for person's unable to care of themself" and  "at
          least if they paid me something then I could afford to get someone in once in a while
          to help me out."  (Doc. 123-7).

A-1

3/5/75 Claim file note reflecting that services would be paid back to 10/18/74.  (Doc. 124-8).

3/12/75 Claim file note documenting adjuster's conversation with Helen Brown (of March 10, 1975) in which he offered to pay her "$60 a week in services, without requiring receipts"and noting she agreed to that amount and "it seemed to please her."  (Doc. 124-10).

3/12/75 Travelers' claim representative's (Joseph Maczko) letter to Helen Brown in follow up to telephone conversation advising her that they will pay her for her services retroactive from October 16, 1974, and confirming that they will start paying her at the rate of $60 per week for her services.  (Doc. 124-11).

4/8/75 Letter from attorney Serotkin to Travelers requesting reimbursement for a van and home modifications, stating, "I am hopeful that The Travelers will maintain as to these two claims, the same prompt and proper fulfillment of its obligations in this matter as it has provided us up to now."  (Doc. 123-10).

9/19/75 Personal injury lawsuit filed by Plaintiff against car wash and The Board of Road Commissioners for Macomb County, Michigan.  (Doc. 123-12).

2/23/76 Notice with complaint and summons by the Insurance Bureau to The Travelers Indemnity Company of the lawsuit filed by Plaintiff against Travelers for payment of collision loss and personal injury protection benefits.  (Doc. 123-13).

3/5/76 Claim file note explaining why suit was filed against Travelers for delay in paying No-Fault benefits; note references letter received from Plaintiff's counsel (Mr. Serotkin) attaching bills for payment, some of which were duplicative and some of which were over one-year old and therefore not submitted timely.  (Doc. 124-28 at 1-2).

4/22/76 Letter from Travelers to attorney Serotkin asking if he wants reimbursement requests sent in by Helen Brown to be sent to his office or directly to her.  (Doc. 124-28 at 3).

5/13/76 Letter from attorney Serotkin to Travelers saying that requests for payment from Helen Brown for lost wages and lost service payments should be made payable and sent directly to the Browns without including Serotkin on the checks.  (Doc. 124-28 at 4).

6/22/76 Lawsuit against Travelers "discontinued" based on amicable settlement.  (Doc. 123-14).

10/26/76 Claim file note re: Helen Brown calling to advise she needs to take a 2-week vacation and get a break from caring for Plaintiff; reflecting her inquiry whether she could put him in a home for the two weeks at a cost of $35 per day or $490; and Travelers' response advising Helen Brown that she would be reimbursed for this expense. (Doc. 124-12).

3/10/77 Claim file note regarding telephone conversation between adjuster (James Jenkins) and Helen Brown of March 9, 1977; adjuster assured her she could get outside medical assistance in future during periods when Plaintiff running a fever due to kidney infection; and that her monthly payment of $255.00 for services would continue; adjuster also noted that she did not ask for an increase but he expected that such a request would have to be considered at some point down the line. (Doc. 124-15).

5/77 Draft copies of payments for medical nursing services paid at $255.00 per month. (Doc. 123-16 at 1-4).

9/29/77 Claim file note documenting Plaintiff's telephone call to Travelers of September 22 in which he requested Travelers pay expenses and salary for an additional person to travel with him as his companion to Florida; Travelers' response that it would not pay for this expense; and the fact that this was communicated to Plaintiff. (Doc. 124-13).

10/19/77 Letter from attorney Brescoll advising that he has taken over the handling of the claim from Serotkin; asserting that Travelers improperly deducting Social Security benefits from no-fault payments and requesting $3,200.00 for improperly withheld benefits. (Doc. 123-15).

11/78 Draft copy of payment for medical nursing services paid at $300.00 per month. (Doc. 123-16 at 5).

[1980's] Deposition testimony by Plaintiff indicating that in the early 80's, the personal injury lawsuit was resolved. (Doc. 123-2 at 6).

4/29/81 Letter from Plaintiff to Travelers requesting reimbursement for medical supplies, nursing services provided by his mother and others in her absence; Plaintiff indicates "I don't know what i'm (sic) going to do once [my mother] is unable to care for me any longer. Hiring outside help sure does get expensive." (Doc. 124-17).

7/6/82 Draft copy of payment for medical nursing services paid at $330.00 per month. (Doc. 123-17).

A-3

9/17/82   Draft copy of payment for medical nursing services paid at $800.00 per month. (Docs. 123-17, 124-14).

[1982]   In deposition testimony, Alex Brown, Plaintiff's father, testified that Helen Brown contacted Travelers and was told that $800.00 was all they could get as a medical benefit for the care provided by the parents. (Doc. 124-4 at 10-11). Plaintiff testified that his mother told him they had come to a figure of $800 and that was all he was entitled to. The conversations occurred sometime in 1982. (Doc. 123-2 at 48, 56).

10/21/82  Claim file note summarizing case and transferring file from Michigan to Florida adjuster; adjuster (Thomas Walsh) notes paying Plaintiff's mother $800 a month for nursing care and occasionally others for nursing care at a rate of $5.00 per hour. (Doc. 124-20).

1/10/84   Letter from rehabilitation consultant to Travelers documenting his telephone call with Plaintiff on December 12, 1983, and his visit with Plaintiff on January 5, 1984; and Plaintiff's request for  nursing services while his parents go away for a day or two which was authorized. (Doc. 124-23 at 2-3).

8/31/84   Letter from rehabilitation consultant to Travelers regarding visit with Plaintiff on August 1, 1984; Plaintiff was interested in whether or not he could purchase supplementary insurance which would cover cost of what Medicare pays; Plaintiff asked if Traveler's would cover cost of putting in hot tub; discussed vocational status. (Doc. 124-23 at 4-6).

1/5/87   Plaintiff responded by letter to an inquiry by Travelers (Sharon Byrnes) about why $800 per month being paid to his mother. After outlining all that she did for him, he added, "Five years ago, I asked the nurse at Travelers in Michigan if I could have a friend or relative provide me with transportation. This would give my mother freedom during the day. They agreed that it was a justifiable expense. Since my friends all had their own lives, relatives were my best option. I am to (sic) vulnerable to some kook out of the paper. I have been paying them $5.00 an hour. . . . I want you to know that I haven't been, or even tried to abuse this privilege. I've met a lot of other quads who go through a (sic) electric wheelchair every year because they know that their insurance will pay for it. They get a $30,000 room added to their house or a shower put in their bathroom, and think nothing of moving out after these expenses have been incurred. I've only had two doorways widened, and not one roll in shower installed in my last three homes. My hiring of help has totaled no more than $4,000 in five years, and I have the book of receipts for your examination." (Doc. 123-18).

A-4

2/10/87-
2/25/89   Claim file notes documenting monthly payments of $800.00 for "services."  (Doc. 124-24).

3/15/88   Plaintiff's letter to Travelers submitting receipts for reimbursement, including "extra nursing receipts" for outside care because his mother broke her foot and needed a 4 to 6-week recovery; Plaintiff advised, "so don't be alarmed at the most recent influx of extra nursing receipts."  (Doc. 123-19).

3/18/88   Travelers' memo to its "structured settlements division" regarding setting up annuity for the $800.00 per month being paid to the insured for full-time nursing care.  (Doc. 124-25).

3/5/92    Medical Representative Report documenting telephone conversation with Plaintiff about home health care; Plaintiff told that if he brought in a relative for his care while his mother was in the hospital instead of using an agency, the relative would not be reimbursed at agency rates.  (Doc. 124-23 at 1).

2/20/93   Deposition testimony by Plaintiff acknowledging his 2/20/93 letter to Travelers enclosing receipts and explaining the reason for attendant care billings and why he has one person in the morning and another at night and discussing how that compares to agency rates.  (Doc. 123-3 at 25).

[1994]    Deposition testimony by Plaintiff that "sometime in '94, I started talking to the nurses coming to the house."  When questioned if he had a concern about his mom being paid more, he responded "at some point." Question: "you inquired of the nurse because you wanted to see if your mom could get paid more?"  Answer: "Correct." Question: "You didn't inquire of the adjuster, but you did inquire of the nurse?" Answer: "I may have mentioned it to the adjuster, but I know I mentioned it to the nurse."  (Doc. 123-2 at 60-61). By his account, the inquiry to nurses was met with silence. (Doc. 123-3 at 6).

2/18/98   Plaintiff's letter to Travelers (Doris Schulz) explaining his current living situation, trying to live independently from his parents in preparation for when they are no longer alive; discusses parents' aging, past conversations with Travelers re: getting outside help to relieve his parents and efforts he has made to find cheaper alternatives for his care; his continued needs; his monthly costs for care being $1,500.00; and his assurance that he does not intend to gouge the insurance company.

[2001-]   In deposition testimony by Plaintiff, he acknowledged that he submitted bills for attendant care beyond those for his mother and they were paid.  After he was married in 2001, his wife received some payments for her services as well.  When his mother died, his wife and father assisted with his care and he continued to receive the $800

per month benefit.  He also acknowledged receiving more than $800 per month for attendant care after 2001.  Despite the fact that Defendant paid for attendant care beyond the $800 amount paid his mother, he denied knowing that Travelers would pay more than that amount for such care.  (Doc. 123-2 at 61-65).

5/26/04   In a letter to Travelers re: receipts for reimbursement, Plaintiff stated that,"I spoke to my attorney about the home modifications and whether they were reimbursable and he informed me they were.  I was worried they weren't since I was never reimbursed for the ceiling lift several years ago."  (Doc. 123-22).

[2005]   In deposition testimony, Plaintiff stated, that he had not sought counsel until he found out he was being cheated.  "I felt cheated for a long time, but I had more awareness in 2005" after learning about a case from his brother.  He also testified that he learned he was entitled to more for attendant care after talking with his counsel, Mr. Zebrowski, although he was unclear if this was in 2005 or just when this was.  His mother passed away in 2004.  (Doc. 123-3 at 9-10).  He also indicated that previously, between 1974 and 1981, when he had other counsel, he had not asked them about this benefit.  (Doc. 123-3 at 30-31).

[2006-]   Deposition testimony by Plaintiff indicating that he purchased a condo in Michigan in about 2006 which he uses in the summers.  While there, in addition to his wife's care, he used professional agency care.  (Doc. 123-2 at 10-11).

A-6